ERIE BUILDERS CONCRETE CO., and Presque Isle Sand & Gravel, Inc., Plaintiffs,

v.

ERIE–WESTERN PENNSYLVANIA PORT AUTHORITY, Erie Sand & Gravel, Inc., Erie Navigation, Inc., Erie Sand Steamship Co., Inc., Sidney E. Smith, Jr., Edward Berry, James R. Walczak and M.O. Smith, Defendants.

Civ. A. No. 88–291 ERIE.

United States District Court, W.D. Pennsylvania.

Feb. 7, 1989.

John G. Hogue, Mansmann Cindrich & Titus, Pittsburgh, Pa., for plaintiffs.

John McLaughlin, Wallace Knox, and Richard Lanzillo, Erie, Pa., for defendant, Erie Western.

Daniel I. Booker, Michael Lowenstein, and Joshua L. Berger, Pittsburgh, Pa., for Erie Sand & Gravel, Erie Navigation, Erie Sand Steamship and Sidney E. Smith.

James W. McDonald, Jr., Erie, Pa., for Berry, Walczak and M.O. Smith.

## OPINION

GERALD J. WEBER, District Judge.

Understanding of the present case requires a little understanding of the history of the Port of Erie and its geography. Forty years ago most of the properties along the south shoreline of Presque Isle Bay including water lots, docks and piers, were owned by the Pennsylvania Railroad Company and leased to its affiliates or customers who operated marine related businesses thereon. They included the Ore Dock, which involved a large crane for unloading incoming iron ore carried by water carriers from the mines for transhipment to steel mills; the Coal Dock which loaded coal, brought to the site by rail for transport by water to various Great Lakes Ports; Grain Elevator Dock to receive, unload, shore and tranship grain from water borne carriers to rail carriers; and sand docks which received lake sand dredged from Lake Erie by water borne vessels for either local use or transhipment.

The ore and coal operations ceased, and the Pennsylvania Railroad began to dispose of these properties during its Bankruptcy administration.

All of the properties involved here were once owned by the Pennsylvania Railroad Company, and all of the business entity parties here, including plaintiff, were at one time tenants of the Pennsylvania Railroad Company, at their present, or, in the case of plaintiffs, former locations.

The Erie–Western Pennsylvania Port Authority was organized under the Pennsylvania Third Class City Port Authorities Act (55 Pa.S.A. § 571 et seq.) which gives it broad powers relating to the acquisition and lease of Erie-bayfront properties. The Port Authority became the owner of the properties involved in the dispute here. Defendants Erie Sand and Gravel, Erie Navigation, Inc., and Erie Sand Steamship Co. were the occupants of the Sassafras

Street dock site and the Ore Dock site under leases from prior owners, which the Port Authority has extended from time to time through the present.

Plaintiff Erie Builders Concrete was originally lessee from the Pennsylvania Railroad Company at a location generally known as the Cascade Docks, and continued that relationship under a successor in title, Perry Shipbuilding Corporation. The lease contained a 90 day termination clause, and Perry served notice of such termination on May 5, 1986. Erie Builders filed an action in the Court of Common Pleas of Erie County contesting the termination, which was dismissed by summary judgment on August 7, 1986.

On March 18, 1987 at a meeting of the Port Authority it was decided that a lease would be granted to Plaintiff for the Grain Elevator Dock site for one year until March 31, 1988. This lease was extended on April 15, 1988 to December 31, 1988. The extension lease (Port Authority Exhibit 16) provided that

> Tenant unconditionally guarantees that it will seek no further extensions of this lease. Tenant further guarantees that it will cease doing business on the Premises on or before December 31, 1988 and that it will vacate the Premises without fail on or before February 5, 1989.
>
> The Landlord and the Tenant specifically stipulate that there is no ongoing responsibility by the Landlord to relocate the Tenant to any other site or location upon the expiration of this lease. The Tenant further understands and assumes that it is its sole responsibility to obtain another site for the conduct of its business on or before December 31, 1988, and that its failure to obtain such location will not in any way cause this lease to be extended or result in any delay in the Tenant's prompt and timely cessation of business and vacation of the premises in accordance with the terms hereof.

Plaintiffs did seek a further extension thereafter but the Port Authority has not acted on these.

On November 5, 1988 plaintiffs filed this broad sweeping equitable action against the various defendants named seeking injunctive and other equitable and declaratory relief.

The Complaint is stated in 9 counts against the various defendants:

Count I  Sherman Act Sec. 1 vs. Port Authority Essential facility

Count II  Sherman Act Sec. 1 vs. Port Authority Rule of Reason

Count III  Sherman Act Sec. 2 vs. all Defendants Monopolization

Count IV  Sherman Act Sect. 2 vs. all Defendants Attempted Monopolization

Count V  Sherman Act Sec. 1 and 2 vs. all Defendants Conspiracy to Monopolize

Count VI  Clayton Act 7 vs. all Defendants Acquisition in attempt to create monopoly

Count VII  Robinson Patman Act vs. Private Defendants *Withdrawn*

Count VIII  Section 1983 vs. Port Authority and Private Defendants Civil Rights Act—denial of bid monopoly

Count IX  Pennsylvania v. Port Authority Pa. Law Claims of unfair trade

## THE ANTITRUST CLAIM

Defendant Port Authority argues that the Local Government Antitrust Act 15 U.S.C. § 35(a) makes local governments immune from damages, interest on damages, costs or attorney's fee arising under the antitrust laws. This is absolute regardless of whether the local governmental body acted within its regulatory authority. *Zapala Gulf Marine v. P.R. Maritime Shipping Authority*, 682 F.Supp. 1345 (E.D.La. 1988).

> The Act applies to any (other) special function governmental unit established by State Law ... 15 U.S.C. 34(1)(B).

Reviewing the *Pa. Third Class City Port Authority Act* and the broad range of powers granted thereunder we have no doubt that the Act applies to the Port Authority here. The Complaint pleads for equitable relief and money damages and the claims for actual damages, punitive damages, treble damages under the antitrust laws,

costs, expenses and attorneys fees must be dismissed.

Nevertheless this Act does not apply to Plaintiffs' claims for equitable relief.

█ With respect to the antitrust claims all defendants raise the defense that the state action doctrine set forth in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) exempts the Port Authority from antitrust liability.

In *Brown* the California legislature enacted a statute regulating the commerce in raisins and gave the Director of Agriculture and State Agricultural Prorate Commission, and other bodies appointed by the state, wide powers of regulation and enforcement. On a challenge under the Sherman Act, the Court held that the Sherman Act did not apply here because the Commission

derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of Sherman Act or in its history which suggests that its purpose was to retrain a state of its officers or agent from activities directed by its legislature ... (p. 350, 63 S.Ct. p. 313).

The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain states action or official action by the state. (p. 351, 63 S.Ct. p. 313).

The state action exemption has been further defined by a number of cases in the Supreme Court and in the inferior federal courts. In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Court held the state action exemption to apply where governmental agencies conduct represents a "clearly articulated" state policy. (p. 413, 98 S.Ct. p. 1137).

In *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1983, the Court held that the governmental agency "need not be able to point to specific detailed legislative authorization." (p. 39, 105 S.Ct. p. 1716). It is sufficient if the legislature has delegated the "authori-

ty to take action that foreseeably will result in anticompetitive effects." (p. 43, 105 S.Ct. p. 1718).

One test of the state action is the forseeability that the state action will result in anticompetitive effects. In *Hancock Industries v. Schaeffer*, 811 F.2d 225 (3d Cir.1987) the question involved the actions of the Chester County Solid Waste Authority which was incorporated under the Pennsylvania Municipality Authorities Act, 53 Pa.Stat.Ann. § 301 et seq. and derived further powers under the Pennsylvania Solid Waste Management Act, 35 Pa.Stat.Ann. § 6018.101 et seq.

The Authority regulated and restricted the wastes which it would accept at its landfills to exclude wastes of out-of-county origin. The Court of Appeals rejected the anti-trust attack on this action, finding that the Authority's action was a foreseeable result of the broad power to regulate given by the legislative acts.

*Hancock* also established that the availability of the state action exemptions does not depend on the subjective motivation of the defendants. "A contrary conclusion would compel the federal courts to intrude upon internal state affairs whenever a plaintiff could present colorable allegations of bad faith on the part of the defendants." See also *Hoover v. Ronwin*, 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984) and *Euster v. Eagle Downs Racing Association*, 677 F.2d 992 (3d Cir.1981).

Similarly in this District an antitrust attack was rejected in *Chambers Development, Inc. v. City of Monroeville*, 617 F.Supp. 820 (W.D.Pa.1985). Plaintiff alleged that the municipal authority had used its powers in an anticompetitive way. The court dismissed the attack, holding that the foreseeability of the anticompetitive effect was the element supporting the state action exemption.

The Plaintiff argues that the state action exemption does not apply here because the Port Authority's action goes beyond the specific legislative authority. Plaintiff's brief states that the exemption would only apply if defendants' activities were in-

volved in the operation of a public port terminal, or even leasing the dock to a private person who was operating the dock for the use of the public. (p. 2 Pls.Supp. Memo of Law.) Plaintiffs argue that construing the powers of the Port Authority to include the power to lease to a private entity would be in the nature of special legislation which the state itself could not do and therefore cannot delegate to the Port Authority.

The Third Class City Port Authorities Act, 55 Pa.S.A. § 571 is an extensive statute granting powers to such an Authority. It occupies several pages of fine print in the Purdon's Statute publication. It would be futile to repeat all the provisions here, but those most pertinent to its grant of powers are:

§ 573. Creation of port authorities; rights or powers

(a) There are hereby authorized to be created bodies corporate and politic in cities of the third class, to be known as the Port Authority of (insert name of city), or other name as the authority shall adopt in accordance with the act of May 24, 1945 (P.L. 967), relating to fictitious names. The authority shall exercise the public powers of the Commonwealth as an agency thereof. Each authority shall be for the purpose of planning, acquiring, holding, constructing, improving, maintaining and operating, owning, leasing, either as lessor or lessee, port facilities and equipment.

§ 573(b)

(5) To acquire, purchase, hold, lease, as lessee and use any franchise, property, real, personal or mixed, tangible or intangible, or any interest therein, necessary or desirable for carrying out the purposes of the authority, and to sell, lease as lessor, transfer and dispose of any property, or interest therein, at any time required by it.

(6) To acquire, by purchase, lease or otherwise, and to construct, improve, maintain, repair and operate facilities.

(11) To make contracts of every name and nature, and to execute all instruments necessary or convenient for the carrying on of its business. Without limiting the generality of the foregoing, the Authority is authorized to enter into contracts for the purpose, lease, operation or management of facilities subject to the jurisdiction of the Interstate Commerce Commission.

(12) Without limitation of the foregoing, to borrow money and accept grants from and to enter contracts, leases or other transactions with any Federal Agency, Commonwealth of Pennsylvania, municipality or corporation.

(15) To do all acts and things necessary for the promotion of its business, and the general welfare of the Authority to carry out the powers granted to it by this Act or any other acts.

(24) To develop programs designed solely to advertise, promote and stimulate the development and use of its port and to join and to authorize its agents, employees and servants to join national and local trade and professional organizations organized for the purpose of promoting the betterment of port facilities and the improvement of the efficiency of persons connected with or employed by the port.

§ 572. Definitions

"Port facility" includes all real and personal property used in the operation of a port terminal, including, but without being limited to, wharves, piers, slips, ferries, docks, graving docks, drydocks, ship building and/or repair yards, bulkheads, dock walls, basins, carfloats, floatbridges, dredging equipment, radio receiving and sending stations, grain or other storage elevators, warehouses, cold storage, tracks, yards, sheds, switches, connections, overhead appliances, bunker coal, oil and fresh water stations, railroads, motor trucks, floating elevators, airports, barges, scows or harbor craft of any kind, markets and every kind of terminal storage or supply depot, now in use or hereafter designed for use, to facilitate transportation and for the handling, storage, loading or unloading of freight at terminals, and equipment, materials and supplies therefor.

"Port terminal" includes any marine, motor truck, railroad and air terminal, any coal, grain, bulk liquids and lumber terminal and any union, freight and other terminals, used or to be used in connection with the transportation or transfer of freight, personnel and equipment.

■ The plaintiffs' argument implies that the Port Authority is limited to leasing its properties to be used as public "terminals" but not to private parties for business use. As an example it cites the example of the Erie Marine Terminal which is leased by the Port Authority to a private operator for use as a public ship terminal for waterborne commerce. The plaintiffs would appear to limit the power of the Port Authority to such leasing. We find nothing in the enabling act, with its broad recitals, to support this contention. Nor do we find any support that the leasing of public property to a private entity for its own business purposes is equivalent to "special legislation" which the state cannot authorize nor delegate. Many of the cases cited have involved the granting of a concession, franchise, or lease to a private party over the objections of competing private interests and the question of "special legislation" has never been raised.

This argument flies in the face of plaintiff's own demand for equitable relief, that the court order Plaintiffs' existing lease for the Grain Elevator site to be extended. Plaintiffs are now private operators on that site in the same manner that Erie Sand & Gravel is on its sites.

There seems to be little room for plaintiffs' argument that the Port Authority exceeded its legislature mandate in its actions. The intent of the statute is clearly contained within its terms, the development of facilities of all kinds for the promotion of water-borne commerce, industry and employment at the Commonwealth's only access to the Great Lakes. Sometimes the plaintiffs argue at cross purposes, as when they argue that the failure of the Port Authority to purchase the former site of plaintiff's operations at the Cascade Dock from Perry Shipbuilding Co., upon which the Port Commission had an option, was part of a conspiracy to monopolize armed at the plaintiffs. (The Port Commission rejected the option because of lack of financing.)

It is difficult to understand the capacity in which the individual defendants are being sued. Sidney E. Smith, Jr. is the president and principal of Erie Sand & Gravel Inc. Defendants Berry, M.O. Smith and Walczak are former or present members of the Port Authority. Plaintiffs Complaint, in a footnote (p. 3) says that Defendants Port Authority, Berry, Walczak and M.O. Smith are collectively referred to as "Port Authority Defendants". Defendants Erie Sand, Erie Steamship, Erie Navigation and Sidney E. Smith, Jr. are collectively referred to as the "Private Defendants".

■ To the extent that plaintiffs allege that individual defendants took action in their official capacities, those actions are protected from liability for money damages under the Local Government Antitrust Act 15 U.S.C. § 35.

■ To the extent that individual defendants or private defendants are being sued in their individual capacities, and not as members of the Port Authority they are immune from antitrust liability under the Noerr–Pennington Doctrine [*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)]. Any unofficial act of the Private Individual defendants directed at influencing the decision of the Port Authority are immune from antitrust liability. This is true "regardless of intent or purpose". This protection applies to an official of a state authority to the extent that the plaintiff alleges that the officials' conduct is taken in his private capacity. *Chambers Development Company vs. Municipality of Monroeville*, 617 F.Supp. 820 (W.D.Pa. 1985). In that case a member of the city council of Monroeville was joined as a defendant, in that he "enlisted the aid of others in a conspiracy, the ultimate purpose of which was to force the closing of plaintiffs' landfill and the destruction of

plaintiff as a going concern." *Chambers* at p. 823. This Court held that the councilman's

official actions in regulating or providing for waste disposal are exempt from antitrust liability under *Parker*. His actions as an individual in attempting to persuade other officials to take a particular course of action are exempt under the *Noerr–Pennington Doctrine*. *Chambers*, p. 823.

See also *Vartan v. Harristown Development Corporation*, 655 F.Supp. 430, 438 n. 5. (M.D.Pa.1987). Therefore the claims against all private party defendants here; Erie Sand & Gravel Inc., Erie Navigation, Inc., Erie Steamship Co., Inc., and Sidney E. Smith, Jr., as "private party defendants", as they have been designated by plaintiff, are barred by the Noerr–Pennington Doctrine.

Plaintiffs and Defendants Erie Sand & Gravel Inc., Erie Steamship Co. and Erie Navigation Inc. are competitors in business involving receipt, storage and sale of sand, gravel, crushed stone aggregates, and the sale of ready-mixed concrete. In summary, Plaintiffs claim that Defendant Port Authority has unfairly favored Defendant Erie Sand and Gravel Inc. by leasing bayfront dock facilities to it without making similar facilities available to Erie Builders Concrete.

At oral argument counsel for Erie Sand & Gravel Inc. stated its position that it is not opposed to renewal of Plaintiffs' lease or the entering into a lease of any kind with respect to the Grain Elevator site and that it opposes solely any challenge in Plaintiffs' civil rights claim to the leases with Erie Sand & Gravel at the Sassafras dock or the Ore Docks, where they have been tenants for over 20 years.

All parties defendant have moved to dismiss or for summary judgment and have filed extensive briefs and supporting evidentiary material. The plaintiffs have responded with briefs and supporting evidentiary material. Oral argument was heard and the matter is ripe for decision.

This Court cannot find any genuine issue of material fact which would preclude summary judgment on the issues of law presented.

## THE CIVIL RIGHTS CLAIM

Plaintiffs claim that denial of a right to bid on a lease for a location was an instrument in the conspiracy as well as a specific instance of failure to follow the requirements of the Port Authority Act. These are part of the claims asserted under Counts III–VI. A discrete and separate claim of Civil Rights violation is set forth in a separate count.

In Count VIII of its complaint the plaintiff contends that the action of the Port Authority was illegal as a deprivation of liberty and property rights contrary to the mandates of the governing statutes and the established case law. This claim is made solely against the Port Authority and the defendants, Berry, Walczak and M.O. Smith as members or former members of the Board of the Port Authority. The plaintiff bases this charge on a violation of 42 U.S.C. § 1983.

There can be no argument that the action of the Port Authority was done under color of authority of state law. If there is any claim of civil rights violation to be made against the private parties individually, it must be made under 42 U.S.C. § 1985 as a conspiracy claim.

A competitive bidding requirement may be the basis for finding a protective liberty or property interest only if it applies to the challenged transaction. Apparently the challenged transaction here attacked is the June 28, 1988 lease of the Ore Dock site to Erie Sand and Gravel, Inc. This was in effect a continuation of prior leases of the same site to Erie Sand and Gravel, Inc., both by Port Authority, and by prior owners of the Ore Dock site before the Port Authority acquired title to the site.

It is not clear when the claim of denial of a property right to bid arose. When this lawsuit was filed Plaintiff was the lessee of a dock site called the Grain Elevator site, a lease granted to it by the Port Commission without bidding. This lease was by its terms temporary, to terminate absolutely

on December 31, 1988, with a stated clause of no extension.

The purpose of this lawsuit was to obtain an injunction against the termination of this Grain Elevator site lease, after plaintiff's attempts to obtain extensions failed.

Plaintiff did, however, on May 23, 1988, by letter of its attorney (Ex. A to Affidavit of Richard J. Carey), ask to be considered for a lease to the Ore Dock Property upon the expiration of plaintiff's present lease of the Grain Elevator site. The letter further stated:

... this request is for the interim period commencing at the expiration of the present lease until a permanent site is available at the proposed new pier south of the Codan property, or until the Port Authority has determined the ultimate and best use for the ore dock site.

The leases to Erie Sand and Gravel Co. for the Sassafras St. dock and the Ore Dock were extended on June 28, 1988 for five years from January 1, 1989 to December 31, 1993 with 3 successive 5 year optional renewal periods.

The lease for the Sassafras Street site provides for an 18 month notice of termination by the Port Authority in its discretion, and a 180 day notice of termination for the Ore Dock site.

The question then became one of whether there is an express statutory authority that any such leases come under the requirement of public bidding in any statute applicable to the Port Authority.

There is no contest that the lease was awarded without public bidding.

The first point of inquiry is to find the requirement for public bidding.

The Third Class City Port Authority Act, 55 Pa.S.A. § 571 et seq. contains no specific clause relating to public bidding. The general grant of authority contains the provision that

each authority shall be for the purpose of planning, acquiring, holding, constructing, improving, maintaining and operating, owning, leasing, either as a lessor or lessee, port facilities and equipment. 55 Pa.S.A. § 573.

The Port Authority Act further provides that:

All contracts and purchases shall be made in accordance with the act of June 23, 1931 (P.L. 932) known as 'The Third Class City Code.'

55 Pa.S.A. § 579.

The Third Class City Code 53 Pa.S.A. § 36901(b) provides

... all services and personal properties required by any City, or any department thereof where the amount exceeds the sum of four thousand dollars, shall be furnished and performed under written contract, and the contract shall be awarded and given to the lowest responsible bidder, after advertising three times....

It would appear on its face that this action applies to purchases of property or services. It does not appear on its face to apply to the leasing of the Port Authority's property.

This is similar to the situation in *Lasday v. Allegheny County*, 499 Pa. 434, 453 A.2d 949 (1982) in which Justice Roberts held that Allegheny County was not required to utilize competitive bidding when leasing concession space at the airport, which the county owned and operated. The County was governed by the Second Class County Code, Act of July 28, 1953, P.L. 723, 16 Pa.S.A. § 5001(a) which provides:

(a) all contracts or purchases in excess of $4,000 shall be in writing and, except those hereinafter mentioned shall not be made except with and from the lowest responsible bidder meeting specification, after due notice in at least one paper of general circulation....

This is almost identical to the provisions of the Third Class City Code, which governs the Port Authority here.

The Court stated:

As the Legislature's use of the phrase 'lowest responsible bidder' makes clear, section 2001(a) is addressed to those situations where, unlike here, the County is spending public funds and thus should be attempting to secure for the taxpayers the least costly contract. Here, as les-

sor, the county is not spending money, but receiving it. The 'lowest responsible bidder' requirement is thus manifestly inapposite to this case and, if applied would lead to the absurd result of requiring the County to award its concession contracts to the concessionaire who promised to pay the County the least rent and the smallest concession fee.

The opinion continued with a reference to the case of *Price v. Philadelphia Parking Authority*, 422 Pa. 317, 221 A.2d 138 (1966) relied upon heavily by plaintiff here. This was also an opinion written by Justice Roberts that held that "competitive bidding required under statute mandating that parking leases be let on a fair competitive basis." 453 A.2d at p. 953. This opinion in *Lasday* specifically distinguishes the case from *Price v. Philadelphia Parking Authority*.

There is no claim made here that the Port Authority established a bidding procedure as did the City of Erie in *Teleprompter of Erie, Inc. v. City of Erie*, 567 F.Supp. 1277 (W.D.Pa.1983) or in *American Totalisator v. Seligman*, 489 Pa. 568, 414 A.2d 1037 (1980) where competitive bidding was elected to be used, there it was held that such provisions were "sufficient to create a property interest in the award of the cable franchise." *Teleprompter*, 567 F.Supp. at p. 1289. Therefore we find that the Port Authority was not required by any statute or by prevailing case law to submit the leases in question to competitive bidding and thus the plaintiff was not deprived of any property interest. The civil rights claims against the Port Authority and the individual defendants Berry, Walczak and M.O. Smith are therefore dismissed.

## WAIVER

We feel it unnecessary to determine the defendants' claim of waiver, in view of the dispositions made herein. This refers to the terms of the present Erie Builders lease where plaintiffs "unconditionally guarantee that it will seek no further extension of this lease" and specifically stipulated that "there is no ongoing responsibili-

ty on the [Port Authority] to relocate [Plaintiffs to any other site or location on the expiration of this lease." All the prior circumstances and negotiations demonstrate that the plaintiffs' lease was to be for a limited and definite term.

This question of waiver was recently considered by the Court of Appeals in *Erie Telecommunications Inc. v. City of Erie*, 853 F.2d 1084 (3 Cir.1988). The Court of Appeals held that:

[C]onstitutional rights, like rights and privileges of lesser importance, may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver. Such volition and understanding are deemed to be, and indeed have been held to be, present, where the parties to the contract have bargaining equality and have negotiated the terms of the contract, and where the waiving party is advised by competent counsel and has engaged in other contract negotiations.

It is clear here that plaintiffs Erie Builders Supply entered into this agreement in its own volition, with full understanding of its rights and the consequences of its waiver, and the waiving party was represented by its own counsel at all stages.

## PENDENT CLAIMS

Count IX of the Complaint is a cause of action under state law for which pendant jurisdiction is alleged. Here we have dismissed all claims under federal jurisdiction and therefore the plaintiffs state claims should be dismissed. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

## CONCLUSION

We conclude that all federal claims, brought either under the antitrust laws or the federal civil rights laws must be dismissed, and the pendant claim must be dismissed also.

## ORDER

AND NOW, this 7th day of February, 1989, the motions of all parties defendant to dismiss or for summary judgment are GRANTED, and the plaintiffs' motion for preliminary injunction is DENIED, and Plaintiff's Complaint is DISMISSED.